## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JOSEPH PUSKARIC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. CIV-15-991-HE ) |
| ROBERT PATTON, individually and in his Official Capacity[1] as Director of the Oklahoma Department of Corrections, et al.,[2] | ) ) ) ) |
| Defendants. | ) ) |

## SUPPLEMENTAL REPORT AND RECOMMENDATION

Plaintiff, Joseph Puskaric, a state prisoner appearing through counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983 alleging defendants violated his constitutional rights. Chief United States District Judge Joe Heaton referred this matter for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B) and (C). Defendant Diana Bilbo has filed a Motion for Summary Judgment [Doc. No. 27] (Def.'s Mot.) to which Plaintiff has responded [Doc. No. 33] (Pl.'s Resp.).

---

[1] Defendant Patton is the former Director of the Oklahoma Department of Corrections (DOC). On July 7, 2016, Joe M. Allbaugh, was appointed to the position of Director of the DOC. By Order dated September 4, 2016, [Doc. No. 15], adopting the August 11, 2016 Report and Recommendation [Doc. No. 14], Chief Judge Heaton substituted Mr. Allbaugh for Defendant Patton as to the official capacity claims asserted against Defendant Patton. *See* Fed. R. Civ. P. 25(d). Mr. Allbaugh was not substituted as to the individual capacity claims asserted against Defendant Patton. By adopting the Report and Recommendation, however, all claims against Defendants Patton and Allbaugh were dismissed for failure to state a claim upon which relief may be granted.

[2] The only claims currently remaining against a named defendant are the individual capacity claims against Defendant Bilbo. Plaintiff has neither identified nor served the unknown Doe defendants and, when given the opportunity to show cause as to why claims against these defendants should not be dismissed [Doc. No. 35], Plaintiff did not respond. Accordingly, it is recommended that the claims against the Doe defendants be dismissed without prejudice for Plaintiff's failure to serve these defendants within the allotted time. *See* Fed. R. Civ. P. 4(m).

Defendant Bilbo has replied [Doc. No. 34] (Def.'s Reply). It is recommended that Defendant Bilbo's Motion for Summary Judgment be granted.

I. **Background and Claims for Relief**

Plaintiff filed his complaint on September 10, 2015, alleging Defendant Bilbo, at that time the Jail Administrator at the Beckham County Detention Center (BCDC), had violated his due process rights by being deliberately indifferent to Plaintiff's serious medical needs while he was a pretrial detainee incarcerated there. [Doc. No. 1] (Pl.'s Compl.).[3] Plaintiff alleges he had suffered a stroke sometime before September 10, 2013, while he was incarcerated in BCDC. Pl.'s Compl. at 2. He claims he did not receive treatment until September 10, 2013, and only then because a Beckham County judge ordered that he be taken to a hospital. *Id.*[4]

Plaintiff claims he suffered a second stroke on April 7, 2014, as he was being arrested in Phoenix, Arizona on an arrest warrant from Beckham County for failure to appear in court. *Id.* Plaintiff believes he was taken to a hospital in Phoenix. But as discussed in further detail below, he was actually incarcerated in the Maricopa County Correctional Health Services facility.

---

[3] Plaintiff's claims arise under the Due Process Clause rather than the Eighth Amendment because Plaintiff was a pretrial detainee when his alleged claims arose. This Court, however, must employ an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983—at least those involving alleged deliberate indifference to serious medical needs. *See Lopez v. LeMaster*, 172 F.3d 756, 759 n. 2 (10th Cir. 1999).

[4] Plaintiff's recollection of events is apparently flawed. Exhibits attached to Defendant Bilbo's Motion demonstrate she was not ordered to provide medical care to Plaintiff in September 2013. Rather, the Beckham County Sheriff's Office and the Beckham County District Attorney's Office agreed Plaintiff should be released on a personal recognizance bond for medical care. *See* Personal Recognizance Bond for Medical Care, [Doc. No. 27-2], 5; Declaration of Diana Bilbo, [Doc No. 27-6], 4]. Two years later, The Honorable Michelle Kirby Roper ordered Plaintiff be evaluated for adjudicative competence by the Oklahoma Department of Mental Health and Substance Abuse Services at the Oklahoma Forensic Center. [Doc. No. 27-17].

Plaintiff alleges that, upon his return to Beckham County, he did not receive any speech or physical rehabilitation while he was awaiting trial and incarcerated in BCDC. Plaintiff claims Defendant Bilbo's delay in affording him medical care in September 2013 and her failure to provide rehabilitative services after Plaintiff's extradition to Oklahoma from Phoenix, Arizona in October 2014, constitute deliberate indifference to his serious medical needs in violation of the Due Process Clause.

## II. Standard of Review

Summary judgment shall be granted where the movant "shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party. *Calhoun v. Gaines*, 982 F.2d 1470, 1472 (10th Cir. 1992); *Manders v. Oklahoma*, 875 F.2d 263, 264 (10th Cir. 1989). A dispute is "genuine," when viewed in this light, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are "facts that might affect the outcome of the suit under the governing law." *Id.* After the movant has fulfilled his initial burden of showing an absence of a genuine issue of material fact and entitlement to judgment as a matter of law, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of material fact. *Whitesel v. Sengenberger*, 222 F.3d 861, 867 (10th Cir. 2000). The nonmoving party "may not rest upon mere allegations" in his pleading to satisfy this requirement. *Anderson*, 477 U.S. at 256. Rather, Fed. R. Civ. P. 56 "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate

"'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56).

## III. Analysis

### A. Undisputed Facts

The District II Drug Task Force arrested Plaintiff on April 15, 2013. [Doc. No. 27-1), 2. Defendant Bilbo states that Plaintiff indicated he needed medical attention when he was booked into BCDC, and he was immediately transported to the Great Plains Medical Center in Elk City, Oklahoma. Def.'s Mot. at 3-4. Medical records dated April 15, 2013, demonstrate Plaintiff was complaining of facial numbness and chest pain. [Doc. No. 27-13], 1. Medical personnel took a chest X-ray administered an EKG, and completed blood tests. *Id.* at 7.

After receiving nitroglycerin, Solumedrol and Toradol, Plaintiff's chest pain improved, but he was still complaining of facial numbness and headache. *Id.* The emergency room doctor ordered a CT scan, after which Plaintiff was diagnosed with Bell's Palsy. *Id.* at 2.[5] Plaintiff was discharged from the hospital to the custody of BCDC officials.[6]

On August 1, 2013, Plaintiff was released on bond. [Doc. No. 27-1], 5. But Plaintiff violated the conditions of his release and was again arrested and booked into BCDC on August 30, 2013. Def.'s Mot. at 10. BCDC records related to the second arrest demonstrate that, upon

---

[5] The Great Plains Regional Medical Center included in Plaintiff's discharge documents a paper describing the symptoms and explaining the causes of Bell's Palsy. The description of the symptoms included "paralysis (loss of movement) on one side of the face." Doc. No. 27-14], 2. According to the document, Bell's Palsy is caused not by a stroke, but by "swelling of the nerve that controls the muscles on that side of the face, usually due to a viral infection like a cold or herpes." *Id.* But the symptoms, like a stroke, "come on quickly over a few hours or days. *Id.*

[6] Plaintiff refused to sign his hospital discharge papers, apparently claiming he had not received treatment. [Doc. No. 27-13], 8. In his deposition, Plaintiff claimed no knowledge of ever having been diagnosed with Bell's Palsy. [Doc. No. 33-2], 60.

Plaintiff's return to BCDC, another medical questionnaire regarding his medical history was completed noting "arthritis" and "heart failure" as his medical conditions. [Doc. No. 27-2], 1.

In his response, Plaintiff alleges he requested medical care on September 5, 2013, September 6, 2013, September 7, 2013, and September 8, 2013. Pl.'s Resp. at 6. In an Inmate Medical/Grievance Request Form dated September 5, 2013, Plaintiff wrote that he wanted to see a doctor and had been "asking since the day I came in to see a doctor." [Doc. No. 33-1], 1-2.[7] It was this statement that elicited the response from Defendant Bilbo noting Plaintiff had not told anyone at booking that he was having any medical issues. *Id.*

After 10:00 p.m. on Sunday, September 8, 2013, Plaintiff wrote a request for medical care on notebook paper. He claimed to have fallen and hit his head earlier in the day and stated that Jason Atwood, a BCDC employee, had observed his injuries after the fall.[8] [Doc. No. 27-9]. In his Declaration concerning his observations of Plaintiff, Mr. Atwood states he does not recall Plaintiff appearing to require immediate medical care during his incarceration in BCDC between August 30, 2013 and September 10, 2013. Mr. Atwood further avers he would have advised a supervisor, had he observed Plaintiff appearing to need immediate medical care. [Doc. No. 27-8], 1. Additionally, Mr. Atwood states he was tasked with handing out meals to BCDC inmates who were required to come to the cell door to get meal trays. Mr. Atwood states he does not recall

---

[7] The exhibit attached to Plaintiff's Response is largely illegible. In his Response, Plaintiff states the request says he had been asking for medical care for "numbness on his left side, especially my face … spitting blood … had this problem before, just not as bad as this. I have an artery on the back of my neck that doesn't get enough blood flow due to surgery I had on my back." Pl.'s Resp. at 9.

[8] In his Declaration concerning his observations of Plaintiff, Mr. Atwood states he does not recall Plaintiff appearing to require immediate medical care during his incarceration in BCDC between August 30, 2013 and September 10, 2013. Mr. Atwood further avers he would have advised a supervisor, had he observed Plaintiff appearing to need medical care. [Doc. No. 27-8], 1.

5

Plaintiff being unable to walk to the front of the cell and get his meal trays during the period at issue. *Id.* at 2.

In the September 8, 2013, request, Plaintiff repeated his accusation that he had been asking for a doctor since his arrival at BCDC. *Id.* at 3-4. Because it was a Sunday night, Defendant Bilbo avers, she did not receive the request until she returned to work Monday morning, September 9, 2013. [Doc. No. 27-6], 4.[9] She further states that no staff member ever advised her that Plaintiff was in need of immediate medical care. *Id.* Nevertheless, BCDC officials transported Plaintiff to Sayre, Oklahoma, to be attended by Dr. Melvin L. Robison the very next day, September 10, 2013. Plaintiff complained of being off balance, of experiencing dizziness, of feeling drunk and of being unable to think. [Doc. No. 27-11]. Dr. Robison, D.O., sent Plaintiff to the nearest emergency room at Sayre Memorial Hospital. *Id.*

According to the medical records generated by the emergency department of Sayre Memorial Hospital, Plaintiff complained of weakness, facial droop, falling, difficulty standing and walking, and impaired speech. [Doc. No. 27-12], 1. A CT scan of Plaintiff's head was determined to be normal with no acute changes, no bony abnormalities, no hemorrhage, no intracranial mass, no midline shift, no hydrocephalus and no atrophy. *Id.* at 2. The radiologist who analyzed the CT scan found no acute intracranial disease process. *Id.* at 7.

Because Plaintiff had been sent to the hospital as directed by Dr. Robison, the Beckham County Sheriff and the District Attorney's Office applied for a personal recognizance bond on behalf of Plaintiff so that he could be released to seek further medical treatment. The Honorable Michelle Roper, Beckham County Judge, signed the personal recognizance bond on September

---

[9] In her Declaration, Defendant Bilbo states that her regular office hours were 8:00 a.m. to 5:00 p.m. Monday through Friday.

10, 2013. [Doc. No. 27-2], 5. Defendant Bilbo states in her Declaration that no judge ever ordered her or any other official at BCDC to take Plaintiff to a doctor as Plaintiff alleged in his Complaint. [Doc. No. 27-6], 4. Plaintiff has presented no evidence to the contrary.

Plaintiff was discharged from the Sayre Memorial Hospital with instructions to schedule an outpatient MRI examination. [Doc. No. 27-12] at 3.

On September 23, 2013, Plaintiff received treatment at the University of Oklahoma Medical Center where a doctor ordered a CT scan and an MRI of his head. Other than one rounded calcified lesion visible on the CT scan, this test was normal and showed no evidence of acute intracranial abnormality. [Doc. No. 27-15], 3. The MRI was determined to be unremarkable with no evidence of restricted diffusion to suggest acute ischemia or infarct. *Id.* at 2.

In his deposition, Plaintiff states he left Oklahoma and went to Arizona for medical treatment. [Doc. No. 33-2], 73. He was examined by doctors at St. Joseph's Hospital in Phoenix, Arizona, and diagnosed with cervical myelopathy and cervical stenosis of the spinal cord. [Doc. No. 33-6], 6. One record stated there was no explanation for the alleged blurry vision in Plaintiff's left eye or his speech difficulty, but stated, "many of his symptoms are attributable to his cord compression." *Id.* at 9.

On October 26, 2013, Plaintiff underwent a surgical procedure to correct his cervical myelopathy and stenosis. *Id.* at 11-16. It appears he was discharged from the hospital on November 1, 2013. *Id.* at 20. In a post-operative appointment, Plaintiff reported the radicular symptoms on his left side were improved, but that he was still experiencing blurry vision, slurred speech and headaches. *Id.* at 21. Dr. Steven Chang, M.D., the doctor who had performed neck surgery, reported that Plaintiff told him he had had a "stroke workup" in Oklahoma that was "negative." *Id.*

7

On April 7, 2014, Plaintiff missed a scheduled court appearance in the Beckham County Court. The judge issued a bench warrant for his arrest. [Doc. No. 27-3], 1. Records from Maricopa County Sheriff's Office and Detention Center contain a hold/extradition form dated October 10, 2014, and Plaintiff waived extradition on October 11, 2014. *Id.* at 2-3. Records from the Maricopa County Correctional Health Services indicate Plaintiff was admitted into that facility on October 10, 2014. He alleges he had another stroke when he was being arrested, but the medical records state Plaintiff did not exhibit facial droop, and his slurred speech "improved" spontaneously as the conversation with medical personnel progressed. On October 21, 2014, a doctor noted Plaintiff was still awaiting pick up on the arrest warrant from Beckham County. The doctor stated, "There are NO neuroanatomic considerations for his somatic complaints of L sided weakness and dysarthria[10] that resolves spontaneously while he's being examined." (emphasis in original). [Doc. No. 27-18], 3.

### B. Statute of Limitations

Defendant Bilbo contends any claims asserted against her arising before September 10, 2013, are barred by the applicable statute of limitations. This point is well-taken.

The statute of limitations period for a § 1983 claim is dictated by the personal injury statute of limitations in the state in which the claim arose, *Wallace v. Kato*, 549 U.S. 384, 387 (2007), and in Oklahoma, that period is two years. Okla. Stat. tit. 12, § 95(A)(3). Federal law governs when the action accrues. *Kripp v. Luton*, 466 F.3d 1171, 1175 (10th Cir. 2006). A § 1983 claim begins to run when the facts that would support a cause of action are or should be apparent. *See Fogle v. Pierson*, 435 F.3d 1252, 1258 (10th Cir. 2006); *see also McCarty v. Gilchrist*, 646 F.3d

---

[10] "Dysarthria" is a condition in which the muscles used for speech are weak and one has difficulty controlling them. Dysarthria often is characterized by slurred or slow speech that can be difficult to understand. *See*www.mayoclinic.org

1281, 1289 (10th Cir. 2011). The Tenth Circuit has also observed: "Since the injury in a § 1983 case is the violation of a constitutional right; such claims accrue when the plaintiff knows or should know that his or her constitutional rights have been violated. This requires the court to identify the constitutional violation and locate it in time." *Smith v. City of Enid*, 149 F.3d 1151, 1154 (10th Cir. 1998) (internal quotations and citations omitted). Moreover, "the issue of when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact." *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir. 1985).

In this case, Plaintiff's Complaint is vague as to when he began experiencing symptoms that he attributes to a stroke.[11] He alleges, however, that he "complained of his condition for days" before he was taken to Dr. Robison on September 10, 2013. Pl.'s Compl. at 2. The Inmate Medical/Grievance Request Form dated September 5, 2013, clearly indicates that Plaintiff believed he was being denied medical care on that date. Moreover, Plaintiff states in his deposition that he knew he had injuries that needed to be addressed, and were not being addressed, when he fell and hit his head. [Doc. No. 33-2], 43. According to Plaintiff's request for medical care, that date was September 8, 2013. [Doc. No. 33-1], 5. But Plaintiff did not file his Complaint until September 10, 2015. Granted, that was the day he was taken to Dr. Robison and then to the hospital, but Plaintiff has presented no evidence to justify finding his claims arose after September 8, 2013.

---

[11] The medical records do not substantiate Plaintiff's claim that he suffered a stroke at any time. Defendant has attached as Exhibit 10 a Declaration of Charles Morgan, M.D., a Board-certified neurologist. Dr. Morgan states, "A review of the medical records … clearly indicates that Mr. Puskaric never had a stroke while in the Beckham County Detention Center." [Doc. No. 27-10], 2. In Dr. Morgan's opinion, Plaintiff's disorder is "psychogenic." Psychogenic disorders, according to Dr. Morgan, may arise from malingering or a conversion disorder—a disorder which "tricks the mind through anxiety or other stress and causes the body to mimic a stroke as a fight or flight remedy." *Id.* at 4.

9

Thus, any claims for deliberate indifference to Plaintiff's serious medical needs arising before September 10, 2013, are barred by the two-year statute of limitations.

Citing a Seventh Circuit case, *Taylor v. Meirick*, 712 F.2d 1112, 1118 (1983) (statute of limitations does not begin to run on a continuing wrong until the wrong is over and done with), Plaintiff contends the statute of limitations did not begin to run, or was tolled, until he was taken to Dr. Robison on September 10, 2013. But the Tenth Circuit Court of Appeals has "never formally adopted the continuing violation doctrine for § 1983 actions[.]" *Gosselin v. Kaufman*, 656 F. App'x 916, 919 (10th Cir. 2016) (unpublished case). Moreover, the Tenth Circuit has held that even if the continuing violation doctrine does apply to § 1983 actions, "the doctrine is triggered by continual unlawful acts, not by continual ill effects from the original violation." *Mata v. Anderson*, 635 F.3d 1250, 1253 (10th Cir. 2011) (internal quotations and citations omitted). Thus, the "continuing wrong" doctrine, even if it applied to civil rights cases, would not apply in this case.

Moreover, tolling of a statute of limitations in a civil rights case follows the law of the state in which the alleged constitutional violation occurred. Under Oklahoma law, a statute of limitations may be tolled in only three circumstances. Tolling may apply if the plaintiff has a legal disability. This tolling rule has been applied in cases where a plaintiff's competency is impaired or where the plaintiff had not yet reached the age of majority before the limitations period expired. The second circumstance applies where defendants engage in false, fraudulent or misleading conduct calculated to lull a plaintiff into sitting on his rights. Finally, in an appropriate case, exceptional circumstances may justify tolling a statute of limitations. *Young v. Davis*, 554 F.3d 1254, 1258 (10th Cir. 2009). Oklahoma's tolling exceptions "are strictly construed and are not enlarged on consideration of apparent hardship or inconvenience." *Resolution Trust Corp. v.*

*Grant*, 901 P.2d 807, 813 (Okla. 1995). In this case, Plaintiff has not demonstrated that circumstances exist which justify the tolling of the limitations period.

Because Plaintiff did not file his Complaint until September 10, 2015, any claims arising before September 10, 2013, are barred by the statute of limitations.

### C. Deliberate Indifference to Serious Medical Needs

Plaintiff contends Defendant Bilbo violated the Due Process Clause by being deliberately indifferent to his serious medical needs for rehabilitative and speech therapy services after he was extradited to Oklahoma from Phoenix, Arizona in 2014. The standard for determining such claims is well-established:

> A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 102 , 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Deliberate indifference" involves both an objective and a subjective component. The objective component is met if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (*quoting Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (further quotation omitted)). The subjective component is met if a prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

*Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

In this case, Plaintiff has produced insufficient evidence to meet either prong of the test for deliberate indifference. As for the objective component, Plaintiff has provided no evidence to suggest he was in serious need of speech or rehabilitative therapy after his extradition to Beckham County from Arizona. Moreover, there are no requests to staff in which Plaintiff revealed his need

11

or desire for such services.[12] The "Patient Discharge Instructions dated November 1, 2013, from St. Joseph's Hospital and Medical Center in Phoenix, Arizona, instruct Plaintiff to follow-up with his surgeon, Steven Chang, within 1 month. [Doc. No. 33-6], 20. Neither of the notes from his two follow-up appointments mentions the need for any sort of therapy. *Id.* at 21-22. The medical records from Maricopa County Correctional Health Services are also silent about the need for any sort of therapy. [Doc. No. 27-18]. The Medical Questionnaire completed after Plaintiff's extradition to Beckham County from Maricopa County, Arizona, mentions neither speech nor motor problems. The document states only that Plaintiff has allergies and fainting spells and is allergic to penicillin. [Doc. No. 27-3], 9. Thus, Plaintiff has failed to produce evidence to meet the objective prong of the test for deliberate indifference, as applied through the Due Process Clause.

As to the subjective prong of the test for deliberate indifference to serious medical needs, the fact that Plaintiff has presented no evidence suggesting Defendant Bilbo, or anyone else employed at BCDC, was aware that he needed speech and physical therapy upon his return to BCDC in October 2014, it stands to reason that their failure to provide such therapy could never meet the subjective prong of the test for deliberate indifference.

Defendant Bilbo's argument in this regard is bolstered by the Declaration of Lori Calip. [Doc. No. 27-7]. In her Declaration, Ms. Calip states she was employed as a detention officer supervisor with the Beckham County Sheriff's Office during the time period relevant to this case. [Doc. No. 27-7]. According to Ms. Calip, sometime after Plaintiff had been extradited from Arizona and re-incarcerated in BCDC, Plaintiff asked her about the possibility of speech or

---

[12] The lack of medical requests also suggests that Plaintiff did not exhaust his administrative remedies before filing this lawsuit, a prerequisite for doing so under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a).

physical therapy at BCDC.  Ms. Calip states she asked Plaintiff if he had made a medical request for such therapy, and he stated he had not.  She then asked Plaintiff if he had a note or prescription from a doctor ordering any kind of therapy, and he stated he did not.  Ms. Calip states she had no further discussions with Plaintiff about therapy, and she did not tell Defendant Bilbo about the conversation.  *Id.* at 2.  Thus, Plaintiff has not demonstrated that Defendant Bilbo was ever aware of his desire to receive any kind of therapy after his extradition from Arizona.

### D. Intentional Infliction of Emotional Distress

Finally, to the extent Plaintiff is raising a federal claim that Defendant Bilbo intentionally subjected him to severe emotional distress, that claim is barred by the PLRA which requires a showing of physical injury before a claim for intentional infliction of emotional stress may be asserted.  *See* 42 U.S.C. § 1997e(e) (No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act[.]).

If Plaintiff is intending to assert a pendent state law claim based on the tort of intentional infliction of emotional distress, the Tenth Circuit has "generally held that if federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."  *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010).  It is recommended that any such state law claim be dismissed without prejudice.

### **RECOMMENDATION**

Defendant Bilbo's Motion for Summary Judgment [Doc. No. 27] should be granted.  All claims against unidentified, unserved defendants should be dismissed without prejudice for failure to serve and failure to prosecute.  Plaintiff's federal claim based on intentional infliction of emotional distress should be dismissed pursuant to the PLRA.  To the extent Plaintiff has stated a

13

pendent state law claim based on the tort of intentional infliction of emotional distress, it is recommended that, if this Report and Recommendation is adopted, the Court decline to exercise its pendent jurisdiction over that state law claim.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to object to this Report and Recommendation. *See* 28 U.S.C. § 636. Any objection must be filed with the Clerk of the District Court by October 18, 2017. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. Pro. 72(b)(2). Failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

## STATUS OF REFERRAL

This Report and Recommendation terminates the referral by the Chief District Judge.

ENTERED this 27th day of September, 2017.

_____
BERNARD M. JONES
UNITED STATES MAGISTRATE JUDGE